IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS J. WOODS,<br><br>Defendant. | No. CR09-1012<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *July 10, 2008.* . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *July 15, 2008.* . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *November 6, 2008.* . . . . . . . . . . . . . . . . . . . . . . . 5

IV. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.    *July 10, 2008.* . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    B.    *July 15, 2008.* . . . . . . . . . . . . . . . . . . . . . . . . . 10
    C.    *November 6, 2008.* . . . . . . . . . . . . . . . . . . . . . . 12

V. REPORT AND RECOMMENDATION. . . . . . . . . . . . . . . . . . 12

## I. INTRODUCTION

On the 30th day of July 2009, this matter came on for hearing on the Motion to Suppress (docket number 13) filed by the Defendant on July 22, 2009. The Government was represented by Assistant United States Attorney Ian Thornhill. Defendant Thomas J. Woods appeared personally and was represented by his attorney, Alfred E. Willett.

## II. PROCEDURAL HISTORY

On June 18, 2009, Defendant was charged by Indictment (docket number 2) with receipt of child pornography (Count 1) and possession of child pornography (Count 2). Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on August 24, 2009. On August 3, however, counsel advised the Court that Defendant would be entering a conditional plea of guilty. A plea change hearing has been set on August 10, 2009.

On July 22, 2009, Defendant timely filed the instant motion to suppress. Defendant asks that the Court enter an order suppressing statements made by him to law enforcement officers on July 10, 2008, July 15, 2008, and November 6, 2008. Defendant also asks that the Court suppress any evidence obtained from a "computer tower" which he provided to law enforcement on July 10, 2008.

## III. RELEVANT FACTS

Special Agent Joe Erion ("SA Erion") of the Iowa Division of Criminal Investigation ("DCI") testified that Iowa law enforcement authorities were contacted in late 2007 by North Carolina authorities regarding the distribution of child pornography using the Internet. The North Carolina investigation revealed images and e-mails which were sent to an America Online (AOL) account registered to Defendant, and bearing his Dubuque, Iowa, address.

Some of the e-mails provided by North Carolina authorities referred to "Tim." In his initial investigation, SA Erion determined that Defendant has an adult son named Tim, living in Anamosa. Accordingly, SA Erion and other agents went to Anamosa to discuss the matter with Tim Woods. Tim gave the agents consent to search his property, but nothing was found.

### A. July 10, 2008

At approximately 6:00 p.m. on July 10, 2008, SA Erion, accompanied by Special Agent Adrian McGeough ("SA McGeough"), went to Defendant's residence to discuss the

2

matter. Defendant was not home, but SA Erion left his business card with Defendant's son's girlfriend, and asked that she tell Defendant to give him a call. Defendant called SA Erion approximately 20-30 minutes later. SA Erion told Defendant that they would like to speak with him regarding "an ongoing investigation." Defendant did not want to meet at his house, but agreed to come to the DCI office at the Diamond Jo Casino in Dubuque.

Approximately one-half hour after he called SA Erion, Defendant arrived at the DCI office. Defendant drove himself to the DCI office. SA Erion described the space as an "open office" measuring approximately 20 feet by 40 feet, and containing five desks. It is not equipped with video recording or audio recording equipment. According to SA Erion, he sat behind a desk, while Defendant sat in a chair closest to the door.

Defendant was not *Mirandized* prior to questioning. According to SA Erion, the interview was "purely investigative," and Defendant was "not in custody." SA Erion told Defendant early in the interview that they were investigating allegations of child pornography. At one point, Defendant made a comment that "maybe I might need a lawyer." SA Erion characterized the remark as "kind of talking to himself out loud." SA Erion told Defendant that he could not give him any advice.

Defendant denied any knowledge of child pornography on his computer. When asked whether the agents could look at his computer, Defendant agreed. Defendant did not want the agents to enter his house, however, when viewing the computer. Defendant offered to retrieve the computer from his house and return to the DCI office in an hour. SA Erion had "reservations" about that alternative, and suggested that the agents follow Defendant to his house and wait in the driveway while Defendant retrieved the computer. Defendant agreed. SA Erion conceded at the hearing that he was concerned that Defendant might attempt to erase incriminating evidence.

After talking to Defendant for approximately 45-50 minutes, the agents followed Defendant as he drove back to his house. SA Erion estimated that it was a 10-15 minute drive from the DCI office to Defendant's residence. Defendant went into his house while

3

the agents remained in their car at the end of the driveway. Defendant returned from his house in "five minutes or less," and placed the "computer tower" in the backseat of the agents' vehicle.

SA Erion testified that he took the computer back to his office and attempted to preview it, but was unable to do so. The computer tower was transported to Cedar Rapids the following morning and a "preview scan" of the hard drive was conducted by a forensic examiner. After seeing a few images which appeared to be child pornography, the agents obtained a state court search warrant for Defendant's computer, house, rental property, vehicle, and person.

### B. July 15, 2008

On the morning of July 15, 2008, SA Erion went to the golf course where Defendant was employed. Defendant was told that the agents wanted to question him again, and he was asked if he would come to the DCI office at the Dubuque Greyhound Park.[1] Defendant agreed and drove himself to the DCI office. The interview was recorded and a videotape was introduced at the instant hearing as Government's Exhibit 1.

Defendant was placed in a small room, measuring approximately 10 feet by 12 feet. Defendant sat in a corner, within arm's length of the door, facing the camera. SA Erion and SA McGeough sat opposite Defendant, under the camera. Defendant was not *Mirandized*. SA Erion testified that they were "following up on leads" and at that time "we don't know who it belongs to."

SA Erion first asked Defendant whether he knew "why we're down here today," and Defendant nodded his head in acknowledgment. SA Erion then told Defendant: "I just want you to know that regardless of what you say today, nobody is being arrested; there is no arrest being made today. We're just talking."

---

[1] It should be noted that this is a different DCI office than the one where Defendant was questioned initially.

Defendant responded as follows: "I want to be cooperative, and as much as I can help even, beyond this, I'd like to. I've had time not to be here. But if you're going to question me, I guess I'm going to need a lawyer. Just put that in as my cooperation with a lawyer sitting here." SA Erion told Defendant that he could not give any advice in that regard, but they would like Defendant to be cooperative. Defendant responded: "But then it's on record that I want a lawyer here."

The interview then continued for approximately an hour. Defendant denied "any other" possession of child pornography and was questioned at length regarding others who have lived at his house. Defendant denied having any more images in his possession and confirmed that all of the images came from the Internet. Defendant told the agents that "I want to cooperate and possibly that cooperation can mean sites." Defendant indicated, however, that "I'm going to need legal counsel." Defendant also declared: "Let me make a statement. No, I've never touched a child. I've never taken a photo of a child." Defendant also asked that agents stop questioning his family, because "nobody that has been in my house has a clue." Defendant told agents that he used the name "Tim" when responding to e-mails.[2] At the conclusion of the interview, Defendant asked, "How come you're not placing me under arrest?" Defendant was allowed to leave at the end of the interview.

At the conclusion of the interview, Defendant asked to speak with SA Erion without the comments being recorded. SA Erion agreed. The record is somewhat imprecise, but Defendant apparently repeated his desire to cooperate with authorities. Defendant was not arrested until June 24, 2009, nearly one year later.

### C. November 6, 2008

Defendant's motion to suppress also refers to a phone interview conducted by SA Erion on November 6, 2008. The interview was conducted after Defendant's counsel sent SA Erion a letter on July 17, 2008, advising him that "if you have the need for any further

---

[2] At one time, a coworker of Defendant, named Tim, lived at Defendant's house.

5

communications with Mr. Woods that you direct them to me as his attorney."[3] In its response to the motion to suppress, the Government states that it does not resist the motion as it pertains to statements obtained on November 6, 2008. No testimony was presented at the instant hearing regarding the November 6 telephonic interview.

## IV. DISCUSSION

In his motion to suppress, Defendant argues that "based upon the fact that he was not advised of his Miranda rights prior to questioning in his July 10 and July 15, 2008 interviews that any statements given by him should be suppressed as they are in violation of his Fifth, Sixth and Fourteenth Amendment rights under the United States Constitution."[4] Defendant further argues that "the Government's receipt of the computer tower after his July 10, 2008 interview is fruits [sic] of the poisonous tree" and should be suppressed for the same reason.[5]

It is undisputed that Defendant was not *Mirandized* prior to his interviews on July 10 or July 15. The principal fighting issue is whether or not a *Miranda* warning was required. In its resistance, the Government argues that Defendant was not in custody on July 10 or July 15, and the *Miranda* provisions are therefore inapplicable.[6]

Law enforcement officials must administer *Miranda* warnings before interrogating individuals in their custody. *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). However, "the task of defining 'custody' is a slippery one." *United States v. Mottl*, 946 F.2d 1366, 1369 (8th Cir. 1991) (quoting *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)).

---

[3] *See* Letter from Alfred E. Willett to Joe Erion, dated July 17, 2008, attached to the Motion to Suppress as Defendant's Exhibit A (docket number 13-2).

[4] *See* Defendant's Motion to Suppress, ¶ 8 at 3 (docket number 13 at 3).

[5] *See Id.*, ¶ 9 at 3 (docket number 13 at 3).

[6] The Government also argues that because no formal criminal proceeding had been initiated, the Sixth Amendment right to counsel is not implicated. *United States v. Morriss*, 531 F.3d 591, 593-94 (8th Cir. 2008). At the time of hearing, Defendant's counsel conceded that Defendant does not have a valid Sixth Amendment argument.

The "ultimate inquiry" in determining whether a suspect is in custody is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). There are two "discreet inquiries" essential to that determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The first inquiry is factual, while the second inquiry "calls for application of the controlling legal standard to the historical facts." *United States v. Axsom*, 289 F.3d 496, 499 (8th Cir. 2002) (quoting *Thompson* at 112).

In *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), the Court identified six "indicia of custody" to consider in determining whether a custodial interrogation occurred:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning." *Axsom*, 289 F.3d at 500-01. "Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *Id.* at 501.

A determination of whether a person is in custody for these purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. Martin*,

369 F.3d 1046, 1056 (8th Cir. 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). Accordingly, the Court must determine whether based on "a totality of circumstances," Defendant was in custody when questioned by SA Erion on July 10 or July 15.

### A. *July 10, 2008*

The first *Griffin* factor is whether Defendant was told that he did not have to respond to questions, that he was free to leave, or that he was not considered under arrest. Under cross-examination at the instant hearing, SA Erion testified that when Defendant arrived at the DCI office on July 10, they did not discuss whether he was "in custody." Defendant was not specifically told that he was free to leave at any time, nor was he told that he did not have to answer any questions if he did not want to. According to SA Erion, "I think we might have offered him something to drink and then sort of got into the conversation right off the bat."

Regarding the second *Griffin* factor, there is no evidence that Defendant's freedom of movement was restrained in any way. SA Erion and SA McGeough were sitting in chairs behind a desk, against the wall. Defendant was sitting in a chair in front of them, with one of the doors to the office directly behind him.

Regarding the third *Griffin* factor, Defendant voluntarily acquiesced to the agents' request that he meet to discuss an ongoing investigation. Defendant first responded to a request that he call SA Erion, and then agreed to meet with SA Erion to answer questions. Defendant chose to meet at the DCI office rather than his home, and he drove himself to the meeting.

Regarding the fourth *Griffin* factor, while the interview on July 10 was not videotaped, there is no evidence that the agents used "strong arm tactics or deceptive stratagems." According to SA Erion, Defendant was told at the beginning of the interview that the agents were conducting an ongoing investigation regarding child pornography.

Defendant does not allege that the agents misled him, raised their voices, or threatened him in any way.

The fifth *Griffin* factor requires a determination of whether the questioning was "police dominated." The questioning occurred in a large "open office." While the record is somewhat imprecise, SA Erion and SA McGeough were apparently the only agents in the office when Defendant was questioned. The mere fact that the interview occurred at the DCI office does not render the atmosphere "police dominated." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). *See also Jenner v. Smith*, 982 F.2d 329, 335 (8th Cir. 1993).

The sixth *Griffin* factor is whether the suspect was placed under arrest at the termination of questioning. Here, Defendant was not arrested until nearly one year later.

The Court believes that the first *Griffin* factor weighs in favor of a finding that Defendant was in custody when he was questioned on July 10. That is, Defendant was not informed at the time of questioning that it was voluntary, that he was free to leave, or that he was not considered under arrest. The remaining five factors set forth in *Griffin* support a finding, however, that Defendant was not in custody. Defendant voluntarily agreed to meet with agents, he helped select the location where the questioning would occur, he drove himself to the DCI office, his freedom of movement was not restrained during questioning, no strong arm tactics or deceptive stratagems were employed, the atmosphere was not "police dominated," and Defendant was allowed to leave at the conclusion of the questioning. In *Mottl*, the Court concluded that an interview conducted at FBI headquarters was noncustodial despite the agents' failure to inform the defendant at the outset of the interview that he was free to leave and free to terminate the interview at any time. *See Mottl*, 946 F.2d at 1370. After considering the totality of the circumstances, the Court concludes that "a reasonable person would have felt at liberty to terminate the

interrogation" and leave. *United States v. Lawson*, 563 F.3d at 750, 753 (8th Cir. 2009). Therefore, Defendant was not "in custody" when questioned on July 10, 2008, and the *Miranda* warnings were not required.[7]

## B. *July 15, 2008*

The circumstances surrounding the July 15 interview are somewhat different. At the outset of the interview, Defendant was told that "regardless of what you say today, nobody is being arrested; there is no arrest being made today." That is, Defendant was effectively advised that he was not considered under arrest. Therefore, the first *Griffin* factor weighs against a finding that Defendant was in custody on July 15.

Regarding the second *Griffin* factor, the interview on July 15 occurred in a small windowless room. Again, however, there is no evidence that Defendant's freedom of movement was restrained during the questioning. Defendant sat within arm's length of the door. The agents sat on the opposite side of the small room.

Regarding the third *Griffin* factor, on July 15 the agents arrived unannounced at Defendant's place of employment. Defendant was asked to come to the DCI office in order to answer additional questions and he agreed. Defendant drove himself to the DCI office in his own vehicle, unaccompanied by any agents.

Regarding the fourth *Griffin* factor, no strong arm tactics were used during the questioning of Defendant on July 15. The videotape establishes that SA Erion was polite and respectful throughout the interview. SA Erion did not raise his voice or threaten Defendant in any way. It can be argued that failing to disclose the existence of the search warrants until the end of the interview constituted a "deceptive stratagem" by the agents.

---

[7] It is undisputed that Defendant voluntarily consented to a search of his "computer tower" following the interview on July 10, 2008. Since the Court has concluded that he was not in custody on that date and no *Miranda* warning was required, Defendant's related argument--that his consent to search the computer is fruit of the poisonous tree--must also fail.

10

There is no evidence, however, that the agents lied to Defendant or otherwise misled him regarding the evidence.

Regarding the fifth *Griffin* factor, the videotape establishes that the atmosphere of the questioning was not police dominated. There were only two agents present in the room while Defendant was being questioned. The agents did not raise their voices or otherwise threaten Defendant.

Regarding the sixth *Griffin* factor, Defendant was promised at the beginning of the interview that he would not be placed under arrest regardless of what statements he may make, and that promise was kept. Defendant left after the interview and was not arrested until nearly one year later.

In *United States v. Hanson*, 237 F.3d 961 (8th Cir. 2001), "ATF agents arrived unannounced at Hanson's residence, awakened him, and transported him in the locked backseat of their vehicle to the federal building for further questioning. The agents then questioned Hanson for several hours in a windowless, interior room before Hanson confessed his involvement in an attempted arson." *LeBrun*, 363 F.3d at 723. The Eighth Circuit panel sitting in *Hanson* concluded that the defendant was in custody when he was questioned by federal agents at the station. In *LeBrun*, however, the Eighth Circuit sitting *en banc* concluded that *Hanson* was "wrongly decided" and specifically overruled it. *Id.* The facts in the instant action weigh even more strongly in favor of a finding that Defendant was not in custody. The agents appeared unannounced at Defendant's workplace and asked that he come to the DCI office to discuss the matter. Defendant agreed and transported himself to the DCI office, where he was questioned for approximately one hour. The Court concludes that all six *Griffin* factors support a finding that Defendant was not in custody when questioned at the DCI office on July 15, 2008.

Therefore, Defendant's *Miranda* rights are not implicated and his motion to suppress on those grounds should be denied.[8]

## C. November 6, 2008

As set forth above, the Government does not resist Defendant's motion to suppress statements made by him in a November 6, 2008 telephone interview with SA Erion. Accordingly, the Court believes that the motion to suppress should be granted regarding any statements made by Defendant on November 6, 2008.

## V. REPORT AND RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the District Court **DENY** in part and **GRANT** in part the Motion to Suppress (docket number 13) filed by the Defendant on July 22, 2009, as follows:

Defendant's request that the Court suppress statements made by him on July 10, 2008 and July 15, 2008, and that the Court suppress evidence obtained from a search of the computer tower which he surrendered on July 10, 2008 should be **DENIED**. Defendant's request that the statements made by him in a telephone interview on November 6, 2008 be suppressed should be **GRANTED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve

---

[8] The Court notes that Defendant has not asserted an independent argument that his statements were not voluntary, nor does it appear that such a claim would have merit. *See, e.g., United States LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) ("A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.") (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). Here, the agents never raised their voices or threatened Defendant in any way. Defendant was not deprived of food, water, or bathroom breaks, and the interrogation was relatively short on both occasions. There is no evidence that Defendant was under the influence of alcohol or controlled substances when questioned. In short, the evidence supports a finding that Defendant's statements on July 10 and July 15 were made voluntarily. *Id.*

and file written objections with the District Court. ***Defendant is reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if Defendant is going to object to this Report and Recommendation, he must promptly order a transcript of the hearing held on July 30, 2009.***

DATED this 4th day of August, 2009.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA